UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | NO. 2:04-CR-35 |
| ) | |
| ROGER DALE FLEENOR ) | |

## **O R D E R**

This criminal matter is before the Court on the defendant's objection to the Report and Recommendation of the United States Magistrate Judge, recommending that the defendant's motion to suppress be denied. [Docs. 29 and 33]. The defendant seeks to suppress all evidence obtained during or after his arrest from the search of his person, his belongings and the vehicle he was driving on December 29, 2003.

Given the detailed summary of the facts outlined by the United States Magistrate Judge in his Report and Recommendation, the Court will not attempt a complete recitation of the facts, but will briefly summarize the background as follows, noting the defendant's objections to the factual findings in the Report and Recommendation:

On the morning of December 29, 2003, Officer Jamey Dunbar, a patrolman employed by the Sullivan County, Tennessee, Sheriff's Department, received a BOLO for Roger Dale Fleenor, along with a description of Fleenor and the vehicle he was driving. Apparently Officer Dunbar's superior officer, Lt. Joey Stricklor, had received information earlier that morning from a confidential informant that Fleenor was to engage in a drug transaction at a trailer park on the Bristol Caverns Highway. After responding to a disturbance call in the same general vicinity, Officer Dunbar witnessed, on the Bristol Caverns Highway, a white Chevrolet Monte Carlo outfitted with "mag" wheels, that was slightly "jacked-up." After seeing this vehicle, Officer Dunbar began to follow it, and contacted Lt. Stricklor to inquire further about Fleenor's description. During this conversation, Lt. Stricklor inquired of Officer Dunbar what the suspect was driving. Officer Dunbar, described the white Monte Carlo, and Lt. Stricklor replied, "I bet that's it." Lt. Stricklor then advised Officer Dunbar to continue to observe the vehicle in an effort to find a reason to make a "*Terry* stop."

What ensued was a two-car parade through a portion of Sullivan County with the defendant apparently being aware that he was being followed by an officer. Officer Dunbar testified that the defendant made numerous turns, as if he were lost. He further testified that he witnessed the car cross the centerline of the roadway,

2

though in a taped conversation between him and Lt. Stricklor, he only indicated that he "got maybe left of center." During the entire pursuit, he witnessed the defendant talking on a cell phone, and at one point he witnessed the defendant speed up, as if he was going to run. At this point Officer Dunbar "paced" the defendant's vehicle for two-tenths of a mile at 55-miles per hour in a 45-mile per hour zone. During a conversation with another officer, apparently in dispatch, Officer Dunbar was informed that there was an outstanding order of attachment for Fleenor issued by the Child Support Referee for Sullivan County.[1]

Ultimately, Officer Dunbar activated his blue lights and stopped the Monte Carlo. After the Monte Carlo was stopped, Fleenor exited the vehicle and began walking back towards the Officer's cruiser. Officer Dunbar, having earlier received information that Fleenor was known to go armed, pulled his sidearm, and ordered Fleenor back into his vehicle. Fleenor complied and Officer Dunbar approached the vehicle. Upon reaching Fleenor's vehicle, Officer Dunbar witnessed the driver's side window cracked about one inch, smelled marijuana smoke, and saw smoke emanating from the ashtray. At this point, Officer Dunbar asked Fleenor if he had been smoking marijuana, and Fleenor admitted that he had. The Officer then did

---

[1] An order of attachment is an <u>order</u> that couples the arrest of the defendant "with a bond". See *Tenn. Code Ann.* § 36-5-405.

a check of Fleenor's drivers license and found that his license had been revoked for DUI. He reapproached the vehicle with a back-up officer, asked Fleenor to step out, and placed him under arrest.

Notably, Officer Dunbar, during his pursuit, ran the tags on the Monte Carlo, but they did not connect Fleenor to the vehicle. After the arrest he learned that the tags on the vehicle were to a 1987 Volvo, and the tags to the 1984 Chevrolet Monte Carlo were inside the car.

Daniel Brace was a passenger in the defendant's vehicle at the time. While Brace had been subpoenaed to testify at the motion hearing, counsel for the defendant indicated that in an effort to obtain cheaper airfare, Brace had gotten a later flight in for the hearing, and would be unable to attend in a timely manner. Brace did not testify, but instead, the defendant's investigator, Brian Hackett, testified to a conversation that he had with Brace. Brace's testimony would essentially be that because they knew that they were being followed by an officer, Fleenor had been very careful to comply with all traffic regulations.

The government argues that the search was valid on either of two grounds. First, that Officer Dunbar had received information that Roger Dale Fleenor would be driving a white, jacked-up Monte Carlo with mag wheels, that Dunbar was then informed that there was a valid order of attachment for Fleenor's arrest, pursuant to which Dunbar had reason to stop the Monte Carlo to verify that Fleenor was in the

4

vehicle, and upon verification, arrest him incident to the order of attachment. Any search of Fleenor and the vehicle would merely be incident to that arrest. Secondly, the government asserts that Officer Dunbar made a valid "*Terry* stop" for a traffic violation, both observed the smell of marijuana emanating from the vehicle and confirmed that Fleenor was driving on a revoked license, arrested him pursuant to said violations, and then made a proper search incident to arrest.

As to the first reason advanced by the government, the defendant challenges Officer Dunbar's knowledge that Fleenor would be driving the white Monte Carlo, arguing that his testimony is inconsistent with the taped conversation between him and Lt. Stricklor. While the taped recording of the conversation between Lt. Sticklor and Officer Dunbar is of poor quality, the conversation is substantially as follows as per a transcription of defense counsel's notes of the conversation:[2]

    Dunbar:    Patch me through to Strickland Internal Affairs

    Strickland:  Strickland

    Dunbar:    hey, what's he look like, any idea?
                        Bushy hair, about 50's

    Strickland:  He is kind of grey headed?

    Dunbar:    Yes

    Strickland:  That's probably gonna be the . . . up is he tall

---

[2] Though transcribed as "Strickland", Officer Dunbar testified that his superior's name was spelled "Stricklor."

>
>
> and lanky?
>
> Dunbar: Yep
>
> Strickland: That's will probably be Roger Dale Fleenor
>
> Dunbar: He came off Bristol Caverns and went on 394
> tag comes back
> not on file he's turning on Broyles Lane
> following him right now
>
> Strickland: What's he got? What's he in?
>
> Dunbar: White Chevrolet Monte Carlo
>
> Strickland: I bet that's it. Does it got the nice wheels on it?
>
> Dunbar: Yep

While the defendant's argument might be very compelling were this conversation the only information Officer Dunbar had received about the Monte Carlo, the defendant's argument ignores Officer Dunbar's testimony, and defies a common sense explanation of the manner in which the events took place. It is unlikely that the taped conversation between Officer Dunbar and Lt. Stricklor contains the first information Officer Dunbar received about the vehicle that Fleenor would be driving. It is undisputed that the conversation took place after Officer Dunbar began to follow the white Monte Carlo. If this conversation were the first information Officer Dunbar had received about the vehicle, why would he have taken note of the vehicle, and have begun following it. Furthermore, Officer Dunbar testified at the hearing, on cross-

6

examination, that he had had an earlier conversation that morning about the vehicle. Later, when questioned by Magistrate Judge Inman, Officer Dunbar testifed that he had been on the lookout for a white Monte Carlo and that he became 100% convinced in the course of his pursuit that he was following Roger Dale Fleenor.

Defendant also challenges whether Fleenor could be properly stopped pursuant to the order of attachment, because the order of attachment originally ordered the appearance of the defendant in court on November 10, 2003, which was prior to the defendant's arrest on December 29, 2003. During the course of Officer Dunbar's pursuit, another officer apparently contacted Child Support Enforcement for Sullivan County and requested a new court date, at which time the officer marked through November 10, 2003 and wrote in "January 12, 2004". In one of the taped conversations, Officer Dunbar was informed that a new court date had been obtained for the order of attachment. The defendant argues, without any authority, that the order of attachment expired when it was not served prior to November 10, 2003, and could only be reissued by a judge or child support referee.

Defendant's counsel is correct that only a judge or child support referee may issue orders of attachment. *Tenn. Code Ann*. § 36-5-405. Of course, as noted by defendant's counsel, the statute does not provide any information about the manner of correcting or reissuing an order of attachment which has not been served by the court date noted on the order of attachment. However, it is notable that the statute does not

7

even require that the court put a court date in the order of attachment.[3] All that is required is that the referee have a hearing to make a finding of willful civil contempt prior to ordering the defendant's incarceration, subsequent to the arrest. *See Tenn. Op. Atty. Gen. No.* 04043. Further, as recognized by the United States Magistrate Judge, the practice followed by the officer in obtaining a new court date for the order of attachment is not an unusual practice in the Tennessee courts, which practice was obviously witnessed by the Magistrate Judge in his many years as Chancellor of the Third Judicial District, and by this Judge in his many years of private practice, handling child support matters. At any rate, Officer Dunbar had no reason to believe that his arrest of Fleenor was incident to anything other than a valid order of attachment.

Though inconsequential given the Court's finding that defendant's arrest was proper pursuant to the order of attachment, the defendant's argument that defendant was not validly stopped for traffic violations will be addressed. The United States Magistrate Judge was placed in the difficult position of having to try and assess the credibility of Officer Dunbar and Brace despite Brace's absence from the hearing, having to rely only upon investigator Hackett's recitation of his conversation with Brace. Of course, this situation was not one of the Court's making. The defendant had

---

[3] Nothing in *Tenn. Code Ann.* § 36-5-405 nor in Tennessee Appellate Court decisions suggests that the order of attachment would be invalid if a court date were set only <u>after</u> the order is served on the defendant.

8

subpoenaed Brace to the hearing. Having learned that, at the very least, Brace would be late to the hearing, defendant chose not to request a continuance. That aside, the Court is doubtful that the outcome would have been otherwise had Brace testified. According to investigator Hackett, Brace admitted that the defendant had been smoking marijuana that morning. The fact that the defendant had smoked marijuana prior to driving, or perhaps even during the drive, coupled with Officer Dunbar's uncontroverted testimony that Fleenor was talking on his cell phone the entire time, and most likely continually searching his rearview mirror to witness the pursuing officer's actions, would lead the Court easily to the conclusion that the officer truthfully testified that the defendant inadvertently crossed the centerline and briefly exceeded the speed limit. The traffic violations would have permitted the officer to make a "*Terry* stop." Upon either learning that Fleenor was driving on a revoked license, or smelling the marijuana smoke in his vehicle, the officer would have had cause to arrest Fleenor.

       The defendant concedes that the officer's motivation for making the traffic stop has no bearing on the constitutionality of the stop itself. *Whren v United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996). Once the defendant was properly arrested, the search without a warrant was proper incident to the defendant's arrest. *See NY v Belton*, 453 U.S. 454 (1981); *United States v. White*, 871 F. 2d 41 (6th Cir. 1989).

9

In summation, the Court **FINDS** that the stop, arrest, and subsequent search of the defendant's vehicle were proper. Accordingly, the Report and Recommendation of the United States Magistrate Judge is **ADOPTED** and **APPROVED**, and the defendant's motion to suppress is **DENIED**. [Docs. 29 and 33].

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
